**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DOUGLAS HANKS,                          :
            Plaintiff,          :
                             :
                             :
                             :    NO. 05-CV-6400
                   v.              :
                             :
COUNTY OF DELAWARE,                      :
POLICE OFFICER SABILLON,                 :
POLICE OFFICER GERMAN,                   :
CAPTAIN JOHN DOE,                        :
CITY OF CHESTER,                         :
            Defendants.       :
                             :

**Anita B. Brody, J.**                           **October 3,  2007**

**<u>MEMORANDUM</u>**

**I. Introduction**

       Plaintiff Douglas Hanks (Hanks)  filed this § 1983 action against City of Chester police

officer German Sabillon (Officer Sabillon)[1] alleging false arrest and imprisonment and malicious

prosecution, and against the City of Chester, Captain John Doe, and the County of Delaware

alleging *Monell* claims.[2]  Officer Sabillon moved for summary judgment on the false arrest, false

---

    [1]  Although Hanks filed these allegations against both Officers German and Sabillon, this Court will recognize that Officer German Sabillon is the same individual (referred to as Officer Sabillon).

    [2]  The false arrest and imprisonment claim is inapplicable to the City of Chester because respondeat superior does not apply.  Any liability on the part of the City of Chester for the arrest is encompassed in the *Monell* claims.

imprisonment, and malicious prosecution claims.  The City of Chester and the County of

Delaware moved for summary judgment on the *Monell* claims.

I grant Officer Sabillon's  motions for summary judgment as to the false arrest, false

imprisonment, and malicious prosecution claims.  I deny the City of Chester and the County of

Delaware's  motions for summary judgment as to the *Monell* claims.

## II. Facts

For purposes of summary judgment, "the nonmoving party's evidence 'is to be believed,

and all justifiable inferences are to be drawn in [the nonmoving party's] favor.'"  *Hunt v.

Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986)).   Here, the facts are stated in the light most favorable to Hanks, and all reasonable

inferences are drawn in Hanks' favor.[3]

In 1981, Hanks, a black man born March 6, 1934, plead guilty to reckless endangerment.

He was placed on probation and ordered to pay $318 in restitution to his wife, Mrs. Sarah Hanks

(Mrs. Hanks).  Hanks also received a notice from Adult Probation stating that failure to pay the

restitution in full would result in a bench warrant for his arrest.   Before his one year probation

was over, Hanks paid the full restitution amount to the probation office in installments with the

understanding that the payments would be transferred to Mrs. Hanks.[4]  Hanks received a

---

[3]  Factual discrepancies will be noted in footnotes.

[4]  There is a dispute over how the restitution was paid.  Mrs. Hanks' testimony was
inconsistent about whether Hanks paid Mrs. Hanks directly with a personal check or paid the
probation office who in turn paid Mrs. Hanks.

confirmation notice when his final restitution payment was satisfied and he signed a document indicating the same.[5]

On September 28, 1982, Mette Melville, a Fiscal Officer of Delaware County Central Collections, wrote a letter to the Honorable Domenic D. Jerome indicating that Hanks was ordered to pay costs but had not complied.  Melville further requested that a bench warrant be issued for contempt of court.  Usually, the Delaware County Office of Probation and Parole would hold a violation hearing, or *Gagnon I* hearing to determine whether restitution was paid before finding a probation violation.  Any documentation indicating whether such a hearing was held for Hanks was destroyed.  A bench warrant was issued on September 30, 1982.  A copy of this 1982 warrant laid unexecuted in a case folder of the offices of Adult Probation and Parole for Delaware County until December 12, 2003.

At approximately 11:00 a.m. on December 12, 2003,  Hanks was driving home when he turned right to head Westbound on Fourth Street in Chester, Pennsylvania.  City of Chester police officers Robert Graves (a black male training officer) and German Sabillon (a white male trainee) were driving in the same direction on Fourth Street in a marked police car approximately one block ahead of Hanks.   Fourth Street is a two-way street with four lanes.  Officer Graves was providing on-the-job training to Officer Sabillon.  The officers stopped on the right side of Fourth Street at the intersection with Ward Street, at which point Hanks drove around the officers' stopped car and turned left on Ward street.[6]  The officers followed Hanks' car on Ward

---

[5] This is disputed.  No documentation verifying payment has been provided to the Court.

[6] The closest that Hanks' car came to the officers' cruiser was approximately 2.5-3 car lengths.

Street for several blocks and pulled up behind Hanks.  One of the officers approached Hanks'

car, stopped at the back of Hanks' driver-side front door, and told Hanks that he had "bogus tags"

without first looking at the inspection stickers.[7]  Hanks maintains that the officers could not have

seen the stickers before the stop.  The two inspection stickers were affixed to the lower left

corner of Hanks' windshield.  Hanks maintains that at that point,

> [t]he officer looked at the stickers and went back to the patrol car.  He came back to
> my car and he looked again, and he – they asked for my license.  Then he went back
> to the patrol car, then he came back to my car and then asked me to get out of – exit
> the vehicle, which I did, and he proceeded to take the stickers off.

(Plaintiff's Dep. 32)  No citation for the stickers was issued at the time.  Hanks received a

citation in the mail three days later.  Hanks contested the citation.[8]  Neither Officer Graves nor

Officer Sabillon appeared at the hearing, and the citation was dismissed.   Officer Graves and

Officer Sabillon indicated that they have discretion to dispose of counterfeit inspection stickers

---

[7]  There is some dispute over whether Officer Graves, Officer Sabillon, or both
approached Hanks' car.  Hanks testified that only the passenger-side officer approached.  Officer
Sabillon testified that both he and Officer Graves approached.

Officer Graves maintains that he identified the stickers as counterfeit based on their color.
Officer Graves is very familiar with counterfeit inspection stickers; he keeps a scrapbook
collection of seized stickers and provides training to other officers about how to identify
counterfeit stickers.  Officer Graves has not produced the stickers seized from Hanks' car.  Both
Officer Graves and Officer Sabillon testified that they have discretion to throw away seized
inspection stickers rather than having to preserve them for evidence.

[8]  Hanks regularly obtained inspection stickers by taking his car to a mechanic employed
by the Philadelphia School District.  The mechanic took Hanks' car to be inspected and Hanks
paid for this service.  The mechanic never told Hanks where he got the car inspected and Hanks
maintains that the stickers on his car were genuine.

Defendants claim that the stickers were counterfeit based on Officer Graves experience
and testimony.  Hanks concedes that Officer Graves has this expertise, but Hanks counters that
there is no other evidence that the stickers were counterfeit: the actual stickers seized were never
produced and Officer Graves did not appear at the hearing at which Hanks disputed the citation.

during the course of a traffic stop.  For the purposes of summary judgment, this traffic stop is deemed unlawful.

After Hanks was asked for his license during the incident on December 12, 2003, a third police officer appeared, approached Hanks, and told Hanks that there was a bench warrant for his arrest.[9]  Hanks was not previously aware of the warrant and was not shown a copy of it.[10]  At that time, Officer Sabillon did not know when the warrant was issued and he only learned the year upon his deposition.

Based on the outstanding bench warrant, Officer Graves and Officer Sabillon arrested Hanks and took him to the police station.  A copy of the bench warrant was faxed to the police station from Delaware County Communications (DELCOM).  After approximately one to one and a half hours, Hanks was transported to the Delaware County Correctional Facility, where he remained for approximately six hours before being released.

 Hanks' son, oldest daughter, and wife (Mrs. Hanks) went to the police station.  Hanks' daughter and Mrs. Hanks met with Nancy Gray, then Deputy Director of Adult Probation and Parole.  Gray asked whether Hanks had paid the restitution due to Mrs. Hanks.  Mrs. Hanks said that Hanks had paid the restitution.  Gray asked if Mrs. Hanks would sign a statement attesting to this fact.  Mrs. Hanks agreed.  Gray faxed this signed statement with a Request to Rescind Bench Warrant to the supervisor of Delaware County Adult Probation and Parole Services.   The bench

---

[9]  According to Officer Graves and Officer Sabillon, there was not a third police officer involved.  The officers contend that they were notified of the bench warrant for Hanks' arrest when they ran a routine check on Hanks' identity through the Delaware County Communications System (DELCOM).

[10]  Between 1981 and 2003, Hanks was stopped by the police approximately seven or eight times while driving, but he was never informed of the outstanding bench warrant.

warrant was vacated and Hanks was released.  At approximately 8:00 p.m. Hanks' family picked him up from the prison and went out to dinner.

Mark Murray, Deputy Director of Adult Probation within the Delaware County Office of Probation and Parole, explained that during the early 1990s the Office formed a policy to destroy and consolidate case documents (other than warrants) that were five to ten years old.  In 1992, a policy was created to input bench warrants into the National Crime Information Center (NCIC) system.  Nevertheless, approximately 850 older warrants, such as the 1982 warrant for Hanks' arrest, are maintained in separate files and are not part of any particular probation officer's caseload. (Murray, pg. 49-50).  Official copies of all file records are maintained by the Office of Judicial Support.

Hanks brought this action because he suffered embarrassment, humiliation, and increased blood pressure from the December 12, 2003 incident.  Hanks seeks $150,000 in compensatory damages.

### III.  Legal Standard for Summary Judgment

The defendants have moved for summary judgment.  Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Facts are material if they might affect the outcome of the case.  *Anderson*, 477 U.S. at 248.  A genuine issue exists when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party.  *Id.* at 248-52.  Summary judgment is appropriate as a matter of law when the non-moving party has failed to make an adequate showing on an essential element of his case, as

to which he has the burden of proof at trial. *See Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 804 (1999).

## IV. Discussion

Hanks brought § 1983 claims against Officer Sabillon alleging false arrest, false imprisonment, and malicious prosecution. Officer Sabillon moved for summary judgment as to each of these claims. Hanks brought *Monell* claims against the City of Chester, Captain John Doe, and the County of Delaware. The City of Chester and the County of Delaware filed motions for summary judgment as to the *Monell* claims.

Officer Sabillon asserts a defense of qualified immunity. The Third Circuit teaches that qualified immunity should be resolved at the earliest stages of litigation, so it will be discussed first. *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002).

The qualified immunity defense is twofold. A court must first ask whether the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right. If answered affirmatively, the question becomes whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Herman v. Carbon County*, 2007 WL 2775162 (3d Cir. 2007) (slip opinion); *Wilson v. Layne*, 526 U.S. 603, 609 (1999). Following this qualified immunity analysis, I will decide whether Officer Sabillon's conduct violated a constitutional right and then, if necessary, address whether his conduct would have been clearly unlawful to a reasonable officer in his situation.

7

## Count I: False Arrest and False Imprisonment

Hanks claims that Officer Sabillon violated his Fourth Amendment right to be free from unreasonable searches and seizures, in this case free from false arrest and false imprisonment. An arresting officer violates this right when the officer arrests a person without probable cause. *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988). Probable cause exists when the facts and circumstances within an arresting officer's knowledge are sufficient to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995). When a defendant is named in a bench warrant, probable cause for arrest exists, and any Fourth Amendment argument arising out of the arrest is without merit even if the bench warrant later turns out to be invalid. *U.S. v. Smith*, 468 F.2d 381 (3d Cir. 1972); *U.S. v. Spencer*, 684 F.2d 220, 223 (2d Cir. 1982) (maintaining that a bench warrant is the equivalent to a judicial determination of probable cause); *Carter v. Baltimore County*, 95 Fed. Appx. 471, 479 (4th Cir. 2004) (non-precedential opinion) (finding that once an arresting police officer ascertained that the plaintiff was the individual listed on the bench warrant, the officer had "probable cause (and indeed the duty) to serve the warrant and take [the plaintiff] into custody."). This is true as long as a reasonably well-trained officer would not have known that the arrest was illegal despite there being a bench warrant. *See U.S. v. Leon*, 468 U.S. 897, 922 n. 23 (1984) (holding that physical evidence seized pursuant to a facially valid warrant is admissible, even though a reviewing court has subsequently determined that the warrant was defective.).[11]

---

[11]  Although *Leon* arose in the context of a search warrant, the principles enunciated apply with equal force to arrest warrants, because both implicate significant Fourth Amendment

Officer Sabillon learned about the outstanding bench warrant from a third officer and relied on the bench warrant to arrest Hanks.  The invalidity of the bench warrant was not revealed until after Hanks was brought to the police station.  Hanks has not demonstrated that the warrant was facially invalid at the time of arrest or that Officer Sabillon reasonably should have known that the arrest was illegal at the time.  Therefore, Officer Sabillon had probable cause to arrest Hanks, Hanks' constitutional claim fails, and Officer Sabillon is entitled to qualified immunity.

Even if the arrest were a constitutional violation, Officer Sabillon could still avail himself of the defense of qualified immunity.  To evaluate this proposition, I move to the second prong of qualified immunity and inquire whether Officer Sabillon's conduct would have been clearly unlawful to a reasonable officer in his situation.  That is, whether it would be clear to a reasonable officer that his conduct violated clearly established law.  *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).

In determining what would have been clearly unlawful to a reasonable officer, the Third Circuit gives "ample room" for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.  *Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000).  The Third Circuit generally extends immunity to officers who make an arrest based on an objectively reasonable belief that there is a valid warrant because police officers are not constitutionally obligated to investigate every claim of innocence.  *See id.* at 273; *Baker v. McCollan*, 443 U.S. 137 at 145-46 (1979).  When a police officer makes an arrest based on statements from a fellow officer that a warrant exists, the arresting officer is entitled to qualified

---

concerns.  *See Malley v. Briggs*, 475 U.S. 335, 344 n.6 (1986).

immunity provided it was objectively reasonable for him to believe that probable cause existed. *See Rogers v. Powell*, 120 F.3d 446, 455 (3d Cir. 1997).

In *Berg*, the Third Circuit found that an arresting officer may not have acted reasonably when arresting an individual named on a facially valid arrest warrant.  219 F.3d at 273.  The Third Circuit remanded *Berg* so the District Court could determine the reasonableness of the arresting officer's behavior, reasoning that reliance on a warrant may not be reasonable if the officer possesses or has reasonable access to information that would make the arrest unreasonable.  Such information could include the age of the warrant and the immediacy of a threat of flight.  In *Berg*, the arresting officer personally observed evidence indicating that the individual arrested was no longer on probation and therefore could not have violated his probation.  *Id*. at 273-74.

In this case, Officer Sabillon was informed about a bench warrant that existed by a third officer arriving at the scene, but the bench warrant later turned out to have been invalid.[12] Officer Sabillon did not know that the bench warrant was invalid when he arrested Hanks, he did not know the age of the bench warrant, and he only learned the age of the bench warrant at his deposition.  Unlike the arresting officer in *Berg*, Officer Sabillon had no independent indications that the warrant was not valid.  Because Officer Sabillon was under no obligation to investigate the validity of the warrant, did not know that the warrant was invalid, and did not even know how old the warrant was, Officer Sabillon's reliance on the warrant to arrest Hanks would not

---

[12]  There is a dispute as to how Officer Sabillon was notified about the bench warrant, but at the summary judgment stage of the proceedings I take the facts in the light most favorable to the nonmoving party and I assume that a third officer arrived and notified Officer Sabillon.

have been clearly unlawful to a reasonable officer in his situation.  Accordingly, Officer Sabillon

is entitled to summary judgment on the false arrest and false imprisonment claims even if he did

not have probable cause to arrest Hanks.[13]

### COUNT II.   Malicious Prosecution

Hanks claims that "Defendants Sabillon and German intentionally, maliciously and

without probable cause, caused the plaintiff to be subject to criminal proceedings."  (Amended

Complaint ¶ 37).  The only "proceeding" at issue is the hearing that followed from the citation

for the counterfeit inspection sticker.

To prevail on a malicious prosecution claim under § 1983, a plaintiff must show that: (1)

the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's

favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted

maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff

---

[13]  Hanks further argues that his arrest was unconstitutional because of the illegality of the
initial traffic stop.  Officer Sabillon did not arrest Hanks upon first conducting the traffic stop or
because of any of Hanks' behavior during the traffic stop.  After Officer Sabillon stopped Hanks,
he learned of the outstanding bench warrant for Hanks' arrest, and arrested Hanks based on that
bench warrant.

Taking the facts in the light most favorable to Hanks, the nonmoving party, the traffic
stop was unlawful because, as Hanks maintains, the officers could not have seen Hanks'
inspection stickers prior to pulling him over.  Hanks seems to argue that the unlawful traffic stop
renders the subsequent arrest unconstitutional for lack of probable cause.

The Seventh Circuit reasoned that, "It would be startling to suggest that because the
police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted
on a warrant – in a sense requiring an official call of 'Olly, Olly, Oxen Free.'" *U.S. v. Green*, 111
F.3d 515, 521 (7th Cir. 1997).  This reasoning makes sense.  Suppose the outstanding warrant
was based upon a failure to appear to face a homicide charge.  We surely would want a police
officer to be able to constitutionally arrest that individual, despite the traffic stop being illegal.

Even if the traffic stop were unlawful, Hanks' arrest would have been constitutional
because of the outstanding bench warrant.  Therefore, it is unnecessary to further analyze the
legality of the traffic stop.

suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal

proceeding. *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003). Mere attendance at a

trial or a hearing does not qualify as a Fourth Amendment seizure. *DiBella v. Borough of*

*Beachwood*, 407 F.3d 599, 603 (3d Cir. 2005).

Hanks was caused to appear at a hearing about the inspection sticker citation. Because

this was mere attendance at a hearing, it did not cause Hanks to be "seized." Therefore, element

(5), that the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a

consequence of a legal proceeding, is not satisfied.

Officer Sabillon's motion for summary judgment as to the malicious prosecution claim

will be granted on the first prong of qualified immunity because Hanks does not present a viable

constitutional claim.

## COUNT III.   *Monell* Claims

In the response to the summary judgment motion, Hanks clarifies his *Monell* claims as:

1.      The City of Chester fails to have "clear, concise, and appropriate police directives
        regarding arrests and/or police stops pursuant to suspected counterfeit inspection stickers
        . . ." (Hanks' Amended Complaint, ¶ 46(b)).

2.      The County of Delaware "improperly supervise[s] and control[s] its employees to ensure
        accuracy of information contained within bench warrants." (Hanks' Amended Complaint,
        ¶ 46(c)).

A municipality or county may not be held vicariously liable under § 1983 for the actions

of its agents, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), but may be liable if it has a

policy or custom which is the "moving force" behind a constitutional violation. *Bd. of the*

*County Comm'rs v. Brown*, 520 U.S. 397, 400 (1997). To prove that a violation occurred, the

plaintiff must show a "direct causal link" between the policy and a constitutional violation. *Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006).[14]  If the policy or custom does not facially violate federal law, causation can be established only by demonstrating that the municipal action was taken with "deliberate indifference as to its known or obvious consequences." *Berg*, 219 F.3d at 276.   A showing of simple or even heightened negligence will not suffice.[15]  *Id*.

Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.   Customs are practices of state officials so permanent and well settled as to virtually constitute law.  *Berg*, 219 F.3d at 275.

---

[14]  Defendants maintain that Hanks' *Monell* claims must fail because no specific officer is being held directly liable for the policies/practices discussed.   (Doc. # 43, pg. 18-19, citing *Williams v. Borough of West Chester*, 891 F.2d 458, 467 (3d Cir. 1989)).   Hanks seems to have attempted to get around this by naming Captain John Doe as a defendant.   Such measures are not necessary.   It is possible for an officer to avail himself or herself of the qualified immunity defense while the municipality is simultaneously liable for unconstitutional practices via *Monell* liability.   *See Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994); *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003).   *See also Bornstad v. Honey Brook Township, et al.*, 211 Fed. Appx. 118, 125 (3d Cir. 2007) (a non-precedential case synthesizing the concept that "a finding of municipal liability does not depend automatically or necessarily on the liability of any police officer," but for municipal liability there must be a violation of the plaintiff's constitutional rights.).   In this case, the officers' qualified immunity does not change that Hanks' constitutional rights might have been violated – thus allowing for *Monell* liability.

[15]  In considering a motion for summary judgment, the evidence must be considered in the light most favorable to the nonmoving party, and the moving party must demonstrate that there is more than just some "metaphysical doubt" as to the material facts.   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   Therefore, if the nonmoving party's evidence is "merely colorable or is not significantly probative," summary judgment may be granted.   *Anderson*, 477 U.S. at 249-50.   But, summary judgment should not be granted if reasonable minds can differ as to the import of the proffered evidence that speaks to an issue of material fact.

In this case, Hanks' *Monell* claims rest upon the assumption that the defendants have policies or practices that cause a pattern of constitutional violations.  Both the claim against the City of Chester and the claim against the County of Delaware are based on the Fourth Amendment right to be free from unreasonable searches and seizures: the claim against the City of Chester is based on the seizure inherent in a traffic stop; and the claim against the County of Delaware is based on the seizure inherent in an arrest.  There remains a dispute as to whether the City of Chester and the County of Delaware have unconstitutional policies or practices.

<u>Claim Against the City of Chester</u>

Hanks alleges that the officers' discretion to dispose of allegedly counterfeit inspection stickers is a policy or practice that violates constitutional rights.

Stopping a car and detaining its occupants is a seizure under the Fourth Amendment.  *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).  Under the Fourth Amendment, an officer may conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  Generally, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.  *Whren v. United States*, 517 U.S. 806, 810 (1996).

Hanks maintains that the December 12, 2003 traffic stop was improper.  Hanks disputes the officers' contentions that they saw Hanks' inspection stickers before stopping him.  Hanks maintains that when he turned left onto Ward Street the officers were stopped on the right side of Fourth Street and that from that vantage point it was not possible for Officer Graves to have seen the inspection stickers on the lower left side of the windshield of Hanks' car.  Officer Graves testified that he has experience in indicating counterfeit inspection stickers and he identified

14

Hanks' stickers as invalid before conducting the traffic stop.  Officers Sabillon and Graves

indicated that they have discretion to immediately dispose of inspection stickers that they scraped

from car windshields.  The officers maintain that they have "ripped up" such stickers in the past

and may continue to destroy them in the future.[16]  If the officers have discretion to destroy the

stickers, then Hanks' evidence for demonstrating the underlying illegality of the traffic stop may

be destroyed.

If City of Chester police officers follow a policy or practice of discarding seized

inspection stickers, there may be a direct causal link between the destruction of the stickers and

the constitutional violation.  This alleged practice potentially deprives citizens, like Hanks, of the

opportunity to defend themselves against illegal traffic stops.  Although the motion for summary

judgment as to the *Monell* claims against the City of Chester is denied, I would reconsider this

ruling upon application of the defendant with further appropriate breifing.

<u>Claim Against the County of Delaware</u>

Hanks argues that because of the way that the County of Delaware stores and maintains

old bench warrants hundreds of other people could potentially be subjected to decades-old arrest

---

[16]  "I throw them out, I rip them, put them in evidence.  If the tag is suspended I put it
with the tag. [sic]  Again, it's officer's discretion.  Every officer's different."
(Sabillon pg. 41).

"Q: Is it discretionary for an officer to throw away the stickers that are removed from vehicles?

A: Sometimes you have no choice because they – some of them are so poor that actually scraping
them they just fall apart.

Q: So in that circumstance when they just are in little pieces, you would just throw them away?

A: Yes."
(Graves p. 25).

warrants for alleged probation violations without a *Gagnon I* hearing.[17]  The County of Delaware keeps approximately 850 outstanding bench warrants in file cabinets in the Delaware County Office of Adult Probation and Parole.  These warrants are not monitored by any particular probation officer.  Hanks seems to maintain that he never had a *Gagnon I* hearing and that the County of Delaware's method of storing old warrants led to this constitutional violation.  *Cf. Berg*, 219 F.3d at 277 (finding that a municipality could be liable for failing to institute a policy that would check against mistakenly issued arrest warrants).

The County of Delaware's method of storing and updating for old outstanding warrants potentially could be "so permanent and well settled" as to constitute a policy or practice that would lead to constitutional violations, thus making *Monell* claims available.  Therefore, the motion for summary judgment as to the *Monell* claims against the County of Delaware is denied.


This Memorandum incorporates the Order this Court issued on September 28, 2007 (Doc. # 49).

s/Anita B. Brody

_____

ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to:

---

[17]  In *Gagnon v. Scarpelli*, the Supreme Court held that a probationer is entitled to a preliminary hearing before probation is revoked, giving rise to the "*Gagnon I*" hearing.  411 U.S. 778, 782 (1973).